UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL F. HANNAGAN,

                                **Plaintiff,**

                  v.                                3:07-CV-795
                                                                (FJS/DEP)

PIEDMONT AIRLINES, INC.; GROUP LONG
TERM DISABILITY, LIFE AND
SUPPLEMENTAL LIFE PLAN FOR
EMPLOYEES OF ALLEGHENY AIRLINES,
INC.; and THE HARTFORD LIFE AND
ACCIDENT INSURANCE COMPANY, INC.,

                                **Defendants.**
_____

**APPEARANCES**                                **OF COUNSEL**

**SATTER & ANDREWS, LLP**               **ROSS P. ANDREWS, ESQ.**
217 South Salina Street, 6th floor
Syracuse, New York 13202
Attorneys for Plaintiff

**UNDERBERG & KESSLER, LLP**         **ROBERT S. DELUCA, ESQ.**
1900 Main Place Tower
Buffalo, New York 14202
Attorneys for Defendants

**SCULLIN, Senior Judge**

## I. INTRODUCTION

      On August 1, 2007, Plaintiff filed this action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), seeking injunctive relief and money damages resulting from Defendant Hartford Life and Accident Insurance Company, Inc.'s ("Hartford") denial of his long term disability ("LTD") insurance claim.

      Currently before the Court are the parties' cross-motions for summary judgment.

Defendants allege that they are entitled to summary judgment on the grounds that (1) Plaintiff is prevented from working as a pilot not because of any disability but because his license to fly was suspended; and (2) Plaintiff failed to prove that Defendant Hartford's decision was arbitrary and capricious. Plaintiff alleges that he is entitled to summary judgment because Defendant Hartford abused its discretion in denying his LTD benefits claim in that he was disabled from flying as that term is defined under the Policy.

## II. BACKGROUND[1]

Plaintiff, a former pilot for Defendant Allegheny Airlines, Inc., asserts a claim for LTD benefits under Group Insurance Policy Number GLT-674138 ("the Policy") that Defendant Hartford issued to Defendant Allegheny Airlines, Inc. Specifically, Plaintiff seeks payment of LTD benefits under the Policy from November 19, 2005, through November 19, 2007, pursuant to 29 U.S.C. § 1132(a)(1)(B).

Plaintiff began his employment with Allegheny Airlines, Inc. in 1986 and stopped working on November 17, 2004, for alleged health reasons.[2] *See* Administrative Record ("AR") at 77. In December of 2004, Plaintiff began treatment with Dr. Allen Miller.[3] Dr. Miller

---

[1] Unless otherwise indicated, the parties do not dispute the facts provided in the "Background" section.

[2] On July 1, 2004, Allegheny Airlines, Inc. merged with Piedmont Airlines, Inc. The surviving corporation was Piedmont Airlines, Inc. However, the transfer of certain employee benefit plans from Allegheny Airlines, Inc. to Piedmont Airlines, Inc. was delayed. Thus, although Plaintiff made his claim after the July 1, 2004 merger, he properly made his claim for LTD benefits under the Group Long Term Disability, Life and Supplemental Life Plan for Employees of Allegheny Airlines, Inc. *See* Defendants' Memorandum of Law at 6.

[3] Prior to meeting with Dr. Miller, Plaintiff went to a walk-in clinic complaining of mood
(continued...)

diagnosed Plaintiff with obsessive compulsive disorder ("OCD") and treated him with an antidepressant medication called Zoloft. Thereafter, Plaintiff was further diagnosed as having an allergy to unknown substances, which causes an anaphylactic reaction and requires him to carry an EpiPen at all times. Due to these diagnoses and treatment, Plaintiff failed his FAA-required annual medical examination and, accordingly, had his pilot's license suspended. *See* AR at 18.

On October 6, 2005, Plaintiff submitted an application for LTD benefits, asserting that his diagnosis of OCD and anaphylaxis rendered him disabled pursuant to the Policy's terms. Defendant Hartford denied Plaintiff's claim, stating that he was not "disabled" under the Policy because it was not the symptoms of his condition that prevented him from performing the essential duties of his occupation, but merely the medication he took because of his disorder.[4]

Plaintiff appealed, and Defendant Hartford again denied his claim.

## III. DISCUSSION

**A.  Summary judgment standard**

Federal Rule of Civil Procedure 56 authorizes the federal courts to enter summary judgment against a party where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*,

---

[3](...continued)
disturbance, insomnia, and difficulty concentrating. *See* AR at 35.

[4] Essentially, Defendant Hartford denied Plaintiff's claim because it believed that Plaintiff was not precluded from flying because of any actual disability, but merely because a pilot cannot pass his FAA physical if taking Zoloft.

477 U.S. 317, 322-23 (1986). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).

**B.     Standard of review of an ERISA plan administrator's decision to deny benefits**

Pursuant to 29 U.S.C. § 1132(a)(1)(B), a court reviews the denial of benefits under a *de novo* standard unless the insurance plan provides that the administrator or fiduciary has discretionary authority to construe the terms of the plan or to determine the applicant's eligibility for benefits. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the policy provides the administrator or fiduciary with such discretion, the court "will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious.'" *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (quotation and other citations omitted).

In the present case, the Policy grants Defendant Hartford "full discretion and authority to determine eligibility benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." *See* Affidavit of Giuseppina Gulino sworn to June 26, 2008 ("Gulino Aff."), at Exhibit "A" ("Policy"), at 16. Accordingly, the Court will only disturb Defendant Hartford's decision if it was arbitrary and capricious.

**C.     The Policy**

The Policy provides LTD benefits for eligible employees of Defendant Allegheny Airlines, Inc. during periods that such employees are "disabled," as the Policy defines that term.

An employee becomes eligible for LTD benefits after the Elimination Period prescribed in the Policy and remains eligible as long as the claimant provides Defendant Hartford with satisfactory proof of entitlement to such benefits. *See generally* Policy.

The Policy defines disability and disabled as follows:

> **Disability or Disabled** means:
> 1. during the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation;
> 2. for the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your indexed Pre-Disability Earnings;
> 3. after that, you are prevented from performing one or more of the Essential Duties of Any Occupation.
>
> * * * * * * * * * *
>
> Your Disability must be the result of:
>    1. accidental bodily injury;
>    2. sickness
>    3. Mental Illness;
>    4. Substance Abuse; or
>    5. pregnancy.
>
> Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation, alone, does not mean that you are Disabled.

*See* Policy at 17. The Policy also defines the term "Essential Duty" as "a duty that: 1. is substantial, not incidental; 2. is fundamental or inherent to the occupation; and 3. cannot be reasonably omitted or changed." *See id.* Finally, the Policy further restricts the receipt of LTD benefits to a claimant whose disability is the result of mental illness or substance abuse to a total of twenty-four months for all such disabilities during the recipient's lifetime. *See id.* at 7.

**D.     The record before the plan administrator**

Upon receipt of Plaintiff's claim for LTD benefits, Defendant Hartford referred Plaintiff's claim to its Behavioral Health Case Management Department ("BHCM") for more careful review.[5] After this review, Defendant Hartford denied Plaintiff's claim, stating that he was not "disabled" under the Policy because it was not the symptoms of his condition that prevented him from performing the essential duties of his occupation, but merely the medication he took because of his disorder.[6]

The notes that Defendant Hartford's BHCM case manager prepared indicate that Dr. Miller first examined Plaintiff on December 20, 2004, at which time Dr. Miller noted that Plaintiff did not have a primary care physician, that he had airline physicals as part of his job, and that he had recently been seen in a walk-in clinic due to complaints of "mood disturbance, insomnia, and difficulty with concentration." *See* AR at 40. Dr. Miller further noted that Plaintiff had a "mild history of OCD" and that he had started taking Zoloft four to five weeks earlier. *See id.* Plaintiff reported to Dr. Miller that "he [was] much improved since starting the Zoloft. He [was] much more relaxed. He [found] that he [was] less obsessed with minor issues. . . . He denie[d] any suicidal thoughts." *See id.* Dr. Miller continued Plaintiff on Zoloft.

On January 21, 2005, Plaintiff again saw Dr. Miller for a followup appointment. *See id.* Plaintiff informed Dr. Miller that, although Zoloft helped, he was still experiencing "episodic obsessional thinking." *See id.* at 46. In response, Dr. Miller increased Plaintiff's daily dosage of

---

[5] Although Defendant had a right (obligation) to have their own doctor evaulate Plaintiff, they chose not to do so.

[6] Essentially, Defendant Hartford denied Plaintiff's claim because it believed that Plaintiff was not precluded from flying because of any actual disability, but merely because a pilot cannot pass his FAA physical if taking Zoloft.

Zoloft from 50 mg per day to 100 mg per day.  *See id.*

During Plaintiff's three-month followup appointment on March 22, 2005, Dr. Miller stated that the increased dose of Zoloft appeared to be "controlling [Plaintiff's] obsessive thinking."  *See id.* at 48.  He further stated that the "patient will be kept on disability as he cannot fly while on medications and unfortunately he does require medications."  *See id.*

The case manager's notes further provide that Plaintiff again met with Dr. Miller on May 25, 2005, when Plaintiff presented with "a severe allergic reaction."  *See id.* at 40, 44.  According to the report, Plaintiff "had eaten Thia (sic) meal, was walking, subsequently developed itching of his arms, throat swelling, lightheadedness, and subsequently became diaphoretic and slumped over."  *See id.*  Plaintiff was taken to the emergency room because of this incident.  *See id.*  Dr. Miller stated that this was a "[q]uestionable anaphylactic reaction," which may have been brought on by a food allergy.  *See id.*  Plaintiff scheduled an appointment with a Dr. Gupta regarding the anaphylaxis incident.  *See id.*

On July 20, 2005, Plaintiff met with Dr. Miller for a final time.  Dr. Miller stated that the Zoloft had controlled Plaintiff's OCD reasonably well and noted that Dr. Gupta was unable to ascertain the exact cause of Plaintiff's anaphylaxis but felt that it might be "idiopathic."  *See id.* at 40, 42.  Finally, Dr. Miller stated that "[Dr. Gupta] advise[d Plaintiff] to carry an EpiPen at all times.  Besides his OCD, this also disqualified [Plaintiff] from flying."  *See id.* at 42.

Defendant Hartford's letter denying Plaintiff's claim does not provide much insight into Defendant Hartford's rationale.  It indicated that Plaintiff failed to meet the definition of "disability" because the medicine Zoloft, rather than the symptoms of his condition, prevented

-7-

him from performing the duties of his occupation. *See* AR at 40.[7] Although the denial letter stated that Plaintiff was required to carry an EpiPen because of his diagnosis of anaphylaxis, it did not state whether the underlying diagnosis or symptoms of this ailment rendered Plaintiff disabled under the Policy's terms. *See id.* Denying Plaintiff's claim, Defendant Hartford stated that "the combined information in your file does not show that you are unable to perform the Essential Duties of Your Occupation on a full time basis as of March 22, 2005. Because of this, we must deny your claim for LTD benefits." *See id.*

In the letter denying Plaintiff's appeal, Defendant Hartford stated that Plaintiff failed to meet the definition of "disability" because his medication effectively ameliorated the effects of his OCD during the Elimination Period. *See id.* at 5. Morever, Defendant Hartford stated that,

> [s]ince you are not precluded from performing your own occupation due to your condition, it is solely due to the FAA having revoked your certificate, you do not meet the definition of disability, which as defined above, states "Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation, alone, does not mean that you are Disabled."

*See id.*

In essence, Defendants argue that Plaintiff failed to prove a "functional impairment or limitation due to his condition" because the medication he was taking corrected or suppressed the symptoms of his diagnosed disorder (OCD). They claim that "[t]he evidence only demonstrates

---

[7] Defendant Hartford argues that Plaintiff's "disability" is merely a "legal disability" and not an actual "disability" as contemplated in the Policy. Essentially, Defendant Hartford has interpreted the Policy as precluding a finding of "disability" if the pilot fails to pass his medical examination necessary to maintain his FAA license because of a drug he is required to take. As discussed below, the FAA maintains an extensive list of prescription drugs which, if taken, preclude a pilot from flying. Zoloft is one such drug.

that Plaintiff was prevented from working in his occupation because his license was under a medical suspension pursuant to Federal Aviation Administration regulations," which does not qualify as a "disability" under the Policy. *See id.*

As stated, Defendants argue that it is merely the revocation of Plaintiff's license that precludes him from flying and not some underlying disability. The fact that there exists a legal disability, however, does not negate a health-related disability on which such legal detriment is based. *See Mass. Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688, 690-91 (2d Cir. 1997); *Paul Revere Life Ins. Co. v. Bavaro*, 957 F. Supp. 444, 449 (S.D.N.Y. 1997). Courts in this Circuit have held that, "if [the claimant] demonstrates to the trier of fact that he is unable to work because of his mental and emotional problems then he is entitled to disability payments, despite the existence of his subsequent legal disability." *Bavaro*, 957 F. Supp. at 449; *see also Millstein*, 129 F.3d at 690-91.

Courts have refused to allow administrators to deny benefits for future risk when such a denial would put claimants and/or others at risk unless the policy at issue expressly denies coverage of such future risks. *See, e.g., Kufner v. Jefferson Pilot Fin. Ins. Co.*, 595 F. Supp. 2d 785, 797 (W.D. Mich. 2009) (finding denial of benefits was arbitrary and capricious because it failed to account for medical evidence of doctor's risk of relapse into substance abuse); *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003) (finding that return to stressful occupation would pose substantial and increased risk of heart attack and could thereby constitute a disability). The inquiry that the administrator must focus on when assessing whether a future risk of harm or relapse is a disability is the probability of its future occurrence. *See Lasser*, 344 F.3d at 391 n.12 (noting that "whether risk of future effects creates a present disability depends

on the probability of the future risk's occurrence").

Defendant Hartford's Policy does not expressly exclude risk of future harm or future manifestations of symptoms from coverage; and, therefore, its failure to consider such is arbitrary and capricious.[8]

Defendants cite to several cases in other circuits to support their position. *See, e.g., Stanford v. Cont'l Cas. Co.*, 514 F.3d 354 (4th Cir. 2008). In *Stanford*, the Fourth Circuit upheld the denial of LTD benefits for a nurse anesthetist who became addicted to Fentanyl, a powerful painkiller and narcotic. *See id.* at 356.[9] While seeking treatment for his addiction, the plaintiff applied for and received LTD benefits; however, the defendants subsequently terminated his benefits because he "no longer suffered any impairment that would prevent him from performing the duties of his occupation as a nurse anesthetist." *Id.* On appeal, the plaintiff argued that he was at risk for relapse if exposed to narcotics and also asserted that the South Carolina Board of Nursing had suspended his license. Concluding that the defendant properly terminated the plaintiff's LTD benefits, the Fourth Circuit held that

> [i]t is important to remember that Stanford is not physically or mentally impaired; though prudence and his license dictate that he cannot return to his old job administering Fentanyl, he is physically and mentally capable of performing that job – and countless other jobs. It would be truly perverse if Stanford were to go on to great success in another occupation but was still able to collect insurance checks on the basis of "disability."

---

[8] Although the Court has found that Defendant Hartford's decision not to consider the future risk of harm was arbitrary, the Court's decision to reinstate Plaintiff's benefits is based on Plaintiff's current disability and not any future risk of harm that disability may present.

[9] The other case on which Defendants rely, *Price v. Disability RMS*, Civil Action No. 06-10251, 2008 WL 763255 (D. Mass. 2008), is factually similar to *Stanford*; and the *Price* court used a substantially similar rationale to reach its conclusion.

*Id.* at 359-60.

  *Stanford* is easily distinguishable from the present matter.  First, the court in *Stanford* noted that the plaintiff was not mentally or physically impaired because of his past drug addiction; it was merely the plaintiff's own fear of relapse and the revocation of his license that prevented him from working.  *See id.*  Here, however, the evidence established that Plaintiff was precluded from flying because of his diagnosis and treatment, and Defendant Hartford did not determine whether Plaintiff would be capable of resuming his duties if he were to stop taking his prescribed medicine.  It is not that a return to work would necessarily further aggravate his condition; the disability arises from the grave risk that Plaintiff would pose to himself and those aboard his plane if he did not take the prescribed medication.[10]

  Finally, in both *Price* and *Stanford*, the evidence established that the revocations of the plaintiffs' licenses were all that precluded them from returning to work in the medical profession. *See Stanford*, 514 F.3d at 359.  In both of these cases, the plaintiffs' licenses were revoked because of their illegal drug use, not because of any underlying disability from which they might

---

[10] Furthermore, although the outcome in *Stanford* may have ultimately been correct, the court used language that could be read as requiring a drug addict to relapse into drug use before he could possibly be considered disabled.  *See Stanford*, 514 F.3d at 359-60.  The better analysis does not entirely dismiss risk of relapse from LTD plans that do not expressly exclude risk of relapse as a disability but focuses on the probability of the relapse occurring.  *See Colby v. Assurant Employee Benefits*, 603 F. Supp. 2d 223, 243-45 (D. Mass. 2009) (citing cases).  This is the focus of courts when the risk of future injury is physical in nature, such as the risk of an attorney suffering another heart attack if he were forced to return to his high stress legal career. *See id.*  These cases do not commit the same "moralistic error of separating risk of relapse into physical sickness from risk of relapse into mental illness." *Id.* at 242 (citation omitted).  It is unreasonable to allow LTD benefits for risk of relapse into physical illness but deny such benefits when a return to work would create a risk of relapse into mental illness or would create a grave risk to the claimant or those under this control.

have suffered. *See id.*[11]  As stated here, Plaintiff's license to fly was revoked not because of illegal conduct but because of his diagnosis of mental disorders and the treatment prescribed to ameliorate their effects.  Contrary to Defendants' assertion, there is no limitation in the Policy stating that a person cannot be disabled, as so defined, because of the medication he is taking for the legitimate treatment of a medical condition. [12]

Plaintiff has shown, through uncontroverted medical evidence, that he suffered from functional limitations before taking the medication – which included obsessive behavior and an inability to focus – that prevented him from flying.  *See* AR 84-85.  Defendants ignored Dr. Miller's assertions that taking the medication was necessary to correct these functional limitations.[13]  It is entirely irrational for Defendants to read the Policy as allowing Defendant Hartford to deny benefits without considering if Plaintiff would be incapable of flying if he were not taking this medication.  This interpretation would allow Defendant Hartford to deny benefits to any pilot who is required to take any medication that the FAA prohibits without determining if, but for the medication, the claimant would be functionally incapable of performing any

---

[11] This is not to say that drug addiction is not a disability.  The Court is merely pointing out that, in these cases, the plaintiffs' licenses were revoked because of their criminal conduct, without regard to any illness from which they suffered.

[12] Moreover, the policy concerns discussed in *Stanford* are not present here.  The *Stanford* court noted that it would be perverse if the plaintiff could continue to collect disability payments because he could not return to work as a nurse, yet would be able to start a new career with great success while still collecting payments.  *See Stanford*, 514 F.3d at 359-60.  In the present matter, the Policy limits payments for disability for mental illness in two ways.  First, such payments are limited to twenty-four months for any such disability for the claimant's lifetime.  *See* Policy at 7.  Second, claimants are only allowed to collect such LTD benefits if it is shown that the claimant is earning less than 80% of his pre-disability income as a result of the disability.  *See id.* at 17.

[13] Dr. Miller clearly stated that Plaintiff was required to take Zoloft to ameliorate the effects of his mental disorder.  *See* AR at 48.

essential function of his occupation. Moreover, it would encourage pilots to hide illnesses that could put the lives of others in jeopardy. Defendant Hartford cannot divorce the underlying need for medication from the symptoms the medication is helping to ameliorate or any side effects the medication may cause.

Reading the language of the Policy that purports to cover disability brought on by mental illness, with the limiting language regarding FAA licensing, the only rational interpretation of the Policy is to require Defendant Hartford to determine if a claimant would be disabled if he left his disease untreated. In the present case, Defendant Hartford did not do so and the undisputed medical record clearly supports Plaintiff's position that the symptoms of his disorder — obsessional thinking, inability to focus and depression — if left untreated, would render him disabled under the Policy. *See* AR at 42, 48.

Additionally, Defendant Hartford has seemingly ignored the risks that Plaintiff's diagnosis of anaphylaxis creates. Plaintiff submitted medical reports with his appeal that list some of the symptoms of anaphylaxis, including hypotension, which may bring on "hypersensitivity reactions, nausea, vomiting, incontinence, diaphoresis, dyspnoea, hypoxia, dizziness, collapse and loss of consciousness." *See* AR at 20-32. Regarding this ailment, Defendant Hartford reasoned that it was not a disability under the Policy because it did not currently impair Plaintiff's ability to operate an aircraft, and there was only an unknown risk that the symptoms would manifest themselves again at some unknown time in the future. *See* Defendants' Reply Memorandum of Law at 13.

Finally, Defendant Hartford argues that the Court should interpret the Policy to require Plaintiff to prove that he is "physically" unable to perform the duties of an airline pilot. In

addition to being irrational, this interpretation renders the Policy internally inconsistent and makes some of its provisions meaningless. *See Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005) (holding that, among others things, courts should consider whether the interpretation creates internal inconsistency or renders provisions meaningless in determining if administrator's decision was arbitrary and capricious (quotation omitted)).

Such an arbitrary interpretation would render promises to cover mental illness and substance abuse nearly meaningless and deprive the Policy's beneficiaries of their reasonable expectations.[14] *See Demirovic v. Building Service 32 B-J Pension Fund*, 467 F.3d 208, 215 (2d Cir. 2006) (holding that interpretations that deprive plan participants of their reasonable expectations are arbitrary and capricious); *see also King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 1002 (8th Cir. 2005) (stating that, if the defendant's "definition of 'accidental bodily injury' were so narrow that it could eliminate many injuries that an average plan participant would expect to be covered based on the plain language of the plan, then there would be a question whether it conflicts with the statutory requirement that a plan be 'written in a manner calculated to be understood by the average plan participant'" (quoting 29 U.S.C. § 1022(a))). Many mental illnesses would not render a person physically incapable of performing the duties of a pilot; the appropriate inquiry, therefore, must focus on whether the mental illness renders the claimant incapable of performing those duties safely.

Based on the foregoing, the court finds that Defendant Hartford arbitrarily and

---

[14] Requiring a claimant to prove "functional" inability to perform an aspect of his job would be more rational if the claimant were claiming a disability brought on by bodily injury. That, however, is not the case here; and Defendant Hartford's denial of benefits for this reason was arbitrary and capricious and deprived Plaintiff of his reasonable expectations.

capriciously denied Plaintiff's claim for LTD benefits.[15]

**E.     Remedy**

In certain circumstances, it is appropriate for the district court to award improperly denied benefits. *See Miller v. United Welfare Fund*, 72 F.3d 1066, 1073-74 (2d Cir. 1995) (citation omitted). Remanding the case to the administrator is only necessary when it is unclear to what extent the evidence justifies a grant of benefits. *See id.* "This principle is consistent with the general understanding of remand as requiring further action in the forum best suited for further proceedings." *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98, 103 (2d Cir. 2005) (citing *Druid Hills Civic Ass'n v. Fed. Highway Admin.*, 833 F.2d 1545, 1549 (11th Cir. 1987)).

Here, Plaintiff provided uncontroverted medical evidence that established that he suffered from two disabilities and that his doctor concluded that these disabilities precluded him from

---

[15] The existence of a conflict of interest further supports the Court's decision. A conflict of interest exists when a plan administrator or fiduciary serves in the dual role of evaluating "whether an employee is eligible for benefits and pay[ing] benefits out of its own pocket." *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). This dual role creates a conflict that courts should consider as one factor in determining whether the administrator's decision was arbitrary and capricious. *See id.* at 2346, 2351. If no other factor weighs in the insured's favor, the insured's claim must fail because the existence of this factor alone is insufficient to render the decision arbitrary and capricious. *See Florczyk v. Metro. Life Ins. Co.*, No. 5:06-CV-0309, 2008 WL 3876096, *3 (N.D.N.Y. July 11, 2008); *Wakkinen v. Unum Life Ins. Co. of Am.*, 531 F.3d 575, 582 (8th Cir. 2008). The "significance" of this factor will depend on the circumstances of the particular case. *Glenn*, 128 S. Ct. at 2346 (citation omitted).

Defendants do not contest that Defendant Hartford acts in this dual role. *See* Defendants' Reply Memorandum of Law at 8. This dual role, alone, fulfills the requirements necessary to find such a conflict of interest. *See Champion v. Black & Decker (U.S.), Inc.*, 550 F.3d 353, 359 (4th Cir. 2008) (citing *Glenn*, 128 S. Ct. at 2346, 2348). As the discussion above demonstrates, Defendant Hartford's determination/interpretation was arbitrary and capricious without considering its conflict of interest. As such, Defendant Hartford's conflict of interest only serves to reinforce further the arbitrariness of its actions.

flying. According to a Department of Labor regulation, "[i]n deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, . . . the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). Although an administrator is not required to afford the treating physician's opinion greater deference than that of the reviewing doctor, it cannot ignore the treating physician's uncontroverted medical evidence. *See Maniatty v. Unumprovident Corp.*, 218 F. Supp. 2d 500, 504 (S.D.N.Y. 2002).

As stated, Defendants failed to have Plaintiff evaluated by its own doctor. Defendant was content to make its decision to deny benefits on the medical record provided by Plaintiff. It is now nearly five years later; it would be, in this Court's opinion, manifestly unfair to remand this matter so that Defendant may now further augment its record. The Court finds that there is sufficient medical evidence in the record to find that Plaintiff's disability falls within the Policy's coverage. Accordingly, the Court reverses the decision of the administrator and awards Plaintiff the denied LTD benefits for the two-year period of time at issue.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion for summary judgment reinstating his LTD benefits

under the Policy is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Plaintiff and close this case.

**IT IS SO ORDERED.**

Dated: March 31, 2010
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge